## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| NIKO RODRIGUEZ | : | NO. 19-64-6 |

### DEFENDANT NIKO RODRIGUEZ'S SENTENCING MEMORANDUM

**TO THE HONORABLE JEFFREY L. SCHMEHL, JUDGE OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA:**

Niko Rodriguez, by and through his attorney, Paul J. Hetznecker, Esquire, files the Sentencing Memorandum in the above captioned matter and submits the following in support thereof:

### I.  PROCEDURAL HISTORY

On January 29, 2019, Niko Rodriguez was arrested based on an Indictment issued by a grand jury sitting in the Eastern District of Pennsylvania charging him with counts 6, 7, 13, 16, 17, and 28, embezzlement and theft of labor union assets and aiding and abetting 29 U.S.C. § 501(c) and 18 U.S.C. § 2. The Indictment alleges that Niko Rodriguez and his six co-defendants "knowingly and intentionally conspired and agreed with each other and others, known and unknown to the grand jury, to commit offenses against the United States, that is,

- 1 -

(1) to embezzle, steal, and unlawfully and willfully abstract and convert to their use and the use of others, the monies, funds, securities, property, and other assets of Local 98, contrary to Title 29, United States Code, Section 50l(c), and (2) to embezzle, steal, and unlawfully and willfully abstract and convert to their use and the use of others, the monies, funds, securities, property, and other assets of the Apprentice Training Fund, contrary to Title 18, United States Code, Section 664."

Following his arraignment on February 1, 2019, Mr. Rodriguez was released on bail.  On December 14, 2022, pursuant to a plea agreement, Mr. Rodriguez entered a guilty plea counts 6, 7, 13, 16, 17, and 28 of the indictment, embezzlement and theft of labor union assets and aiding and abetting 29 U.S.C. § 501(c) and 18 U.S.C. § 2. Sentencing is currently scheduled for February 22, 2024.

## II.     <u>OBJECTIONS TO THE PRESENTENCE REPORT</u>

There are no objections to the Presentence Report from Mr. Rodriguez.

## III.    <u>DETERMINING THE APPROPRIATE SENTENCE</u>

In <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), the United States Supreme Court held that the Sixth Amendment right to a jury trial prevented judges from fact finding that expose a defendant to increased prison time. The Supreme Court excised the provision of the Sentencing Reform Act that made the guidelines

mandatory and rendered the Sentencing Guidelines "effectively advisory." <u>Booker</u>, 125 S. Ct. at 757.  The Supreme Court found that the lower courts must consider the sentencing guideline range as one factor among many factors as set forth in Section 3553(a). <u>Kimbrough v. United States</u>, 128 S. Ct. 558 (2007); <u>Gall v. United States</u>, 128 S. Ct. 586 (2007).  In order to accomplish this purpose, the sentencing court must consider the factors as set forth in 3553(a). The guiding principle when applying these factors under Section 3553(a) is to "impose a sentence sufficient but not greater than necessary, and to comply with the purposes set forth in Paragraph 2." Section 3553(a) (2)  which states that such purposes are:

> (a)  To reflect the seriousness of the offense, to promote respect for the law, and to provide for just punishment for the offense:
>
> (b)  To afford adequate deterrence to criminal conduct;
>
> (c)  To protect the public from further crimes of the defendant; and,
>
> (d)  To provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In <u>United States v. Rita</u>, 125 S. Ct. 2456 (2007) the Supreme Court made it clear that the district court may ignore the guidelines and impose a completely different sentence than that which is recommended. The Supreme Court has essentially freed the district courts to disagree with the policy  decisions of Congress or the Sentencing Commission set forth within the guidelines. Following

the Supreme Court's decisions in <u>United States v. Booker</u>, supra., <u>United States v. Rita</u>, supra., <u>Gall v. United States</u>, supra., and <u>Kimbrough v. United States</u>, supra., a sentencing court may now consider a defendant's age, education and vocational skills, or lack thereof, mental, or emotional condition, physical conditions including drug and alcohol addiction, employment record, family ties and responsibilities and the lack of supervision and/or guidance as a young person. The guidelines previously prohibited the sentencing court from considering these factors, unless the situation was so exceptional that it was deemed to be "outside the heartland" of the cases generally seen by the court. Although the departures under the guidelines still require extraordinary circumstances post-<u>Booker</u>, this is distinguished from variances which have no relationship to the unusual circumstances that may be granted when departures are not only unwarranted, but prohibited. <u>United States v. Severino</u>, 454 F.3d 206 (3rd Cir. 2006): <u>Gall v. United States</u>, supra.

In both <u>United States v. Cooper</u>, 437 F.3d 324 (3rd Cir. 2006) and <u>United States v. Gunter</u>, 462 F.3d 237 (3rd Cir. 2006), the Third Circuit established the procedure for sentencing hearings. Before fashioning the sentence the district courts must calculate the guideline range, factoring in any objections, rule on any departure motions made pursuant to the guidelines, and then impose a sentence in light of all the relevant 3553(a) factors. The procedure as established in <u>United States v. Gunter</u>, supra., requires courts to then consider all of the factors as set

- 4 -

forth in the record under Section 3553(a), and provide a meaningful analysis of those factors as a basis for imposing the sentence. <u>United States v. Grier</u>, 475 F.3d 556 (3rd Cir. 2007), <u>United States v. Tomko</u>, 562 F.3d 558 (3rd Cir. 2009)

## IV.   MOTIONS FOR DEPARTURE AND DOWNWARD VARIANCES

There are no Motions for Departure in this case. In addition, Mr. Rodriguez is not submitting a request for a downward variance as the lowest end of the guideline range calls for non-incarceration. Counsel submits several mitigating factors in support of a request for a probationary sentence.

## V.   SENTENCING FACTORS

Prior to fashioning the appropriate sentence, one that is "not greater than necessary," we respectfully request that Your Honor consider the factors set forth below under each subsection of Section 3553(a).

### A.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

As the Third Circuit has noted, downward variances have nothing to do with downward departures based on extraordinary circumstances, and may be granted when departures are not only unwarranted but prohibited. <u>United States v. Severino</u>, 454 F.3d 211 (3rd Cir. 2006).

Since the guideline range is 0-6 months incarceration the following mitigating factors are presented in support of a probationary sentence which would be within guidelines.

Given the fact that a probationary sentence is within the guideline range Counsel presents the following factors in support of his request for the lowest end of the guideline range on behalf of Mr. Rodriguez.

Prior to presenting the mitigating factors, a close examination of my client's background provides Your Honor with a deeper understanding of Niko Rodriguez and his contributions to his family and the community.

Niko Rodriguez was born into an intact family with loving parents and two older siblings. Over time his parents separated and then divorced. His parents' separation had a huge impact on Niko. Quiet and unassuming, Mr. Rodriguez learned to cope with the separation and has never exhibited any bitterness toward either parent because of the separation. As his father Jose Rodriguez recounts, Niko avoided trouble and always told the truth. As reflected in the numerous letters of support (see *Character Letters*), everyone in the family adores Niko and strongly attests to his loving spirit and supportive nature. Niko's father and mother (Dorothy Rodriguez) always worked hard which helped to instill a strong work ethic in their children. Mr. Rodriguez has always been gainfully employed, at times working two jobs to support himself. After more than a decade working at IBEW,  Mr. Rodriguez resigned in December 2022. Presently, Mr. Rodriguez is working full-time as an assistant project manager for Hatzel and Buehler, Inc., a union commercial contractor. In addition, Mr. Rodriguez has reenrolled in the Community College of Philadelphia in order to complete his education which he

started more than a decade ago. A loving husband to his wife Francesca, and father to his three girls Sonia, Naomi and Celeste, Mr. Rodriguez spends his free time with the family.

The first argument in support of a probationary sentence is based upon Mr. Rodriguez's unique position in this indictment. By all accounts, including the government, Niko Rodriguez was a hard-working, dutiful young man who acted at the behest of his boss John Dougherty. While in no way does this excuse the criminal conduct of Mr. Rodriguez, his relationship with Mr. Dougherty puts his criminal conduct in proper context.

Mr. Rodriguez has known the co-defendant John Dougherty since he was a teenager and has a long-standing and deep personal relationship with the Dougherty family. John Dougherty played a critical role in Mr. Rodriguez's life for more than a decade. According to many family members from both Mr. Rodriguez's family and the Dougherty family, John was like a second father to Niko.

As reflected in the Presentence Report and the more than two dozen character letters submitted on behalf of Mr. Rodriguez, he is a dedicated worker. On multiple occasions Mr. Rodriguez purchased items for his family and household on the union's credit card. Mr. Rodriguez's decisions to violate the law were solely his decisions, but they were not made in a vacuum. As reflected in the Presentence Report, Mr. Rodriguez purchased merchandise for himself and

family at a Lowe's store using the union credit card for $135.62 in November 2014, almost ten years ago. There was another purchase at an IKEA in December 2014 using the union credit card for $409.32. As set forth in the Indictment, there were four additional purchases for his family using the union card in May, June, July and November of 2015. Those four separate purchases amounted to $207.67, $67.69, $113.51, and $145.74. The items illegally purchased by Mr. Rodriguez included baby lotion, toothbrushes, laundry detergent, a baby sippy cup, movie ticket gift card, cereal, sugar, milk, bananas, baby food, diapers, eggs, paper towels, and bottled water among other personal household items. Mr. Rodriguez has taken responsibility for these crimes committed almost a decade ago and has moved on with his life. Among the two dozen character letters submitted on behalf of Mr. Rodriguez, there are several that offer important insight into the decisions made by Mr. Rodriguez that should be taken into consideration. The first is from paternal aunt, Ms. Toni Kist who wrote that his relative culpability should be viewed in light of his "willful, or blindly submitting to 'authority figures,'" but that he "must accept the ramifications" of his illegal conduct. The second is from a friend, Kevin McNicholas, who characterizes the decisions made by Mr. Rodriguez almost a decade ago as misguided by a person in his mid-twenties who "has since moved on with his life." Each of these testimonials offers context for Mr. Rodriguez's criminal conduct and his decision to accept full responsibility and to be held accountable.

The second mitigating factor that we hope Your Honor will consider is Mr. Rodriguez's family responsibilities and his good works among his community of family and friends. As a result of the fact that there were several instances of theft using the union credit card, Mr. Rodriguez's conduct cannot fairly be characterized as "aberrant." However, based on the more than two dozen letters of support, the criminal conduct in this case does not reflect his true character.

More than two dozen members of Mr. Rodriguez's family and community offer strong statements affirming that he is an honest, hardworking, loving and supportive individual. In addition to assisting with his daughter's activities, Mr. Rodriguez has given back to the community through food distribution and clothing drives for the homeless. While this does not excuse Mr. Rodriguez's conduct it demonstrates that he is much more than the crimes charged in the Indictment.

Finally, Mr. Rodriguez feels great remorse for his criminal conduct. A cousin, Maria Jellison-Lynch, wrote that "Niko has experienced great remorse." Reflecting on Mr. Rodriguez's character friend Michael Grasso wrote, it is "not surprising that he accepted responsibility." Niko Rodriguez has suffered great humiliation and feels deep remorse for his actions. Mr. Rodriguez is building a better future for himself and his family. My hope is that Your Honor considers the mitigating factors set forth above and imposes a probationary sentence.

**B.   The Need for the Sentence Imposed to Reflect the Seriousness of**

**the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.**

There is no question that the criminal conduct engaged in by Mr. Rodriguez is serious and that respect for the law must be a consideration in determining a just punishment. In the process of making the determination of what constitutes a just punishment we cannot overlook the significant impact that lengthy periods of incarceration have on defendants' families and communities. More significantly, the fact that the Federal Sentencing Guidelines fails to incorporate the long-term detrimental impact that incarceration has on society and therefore, necessitates the development of a new educated perspective.

According to Marie Gottschalk, the criminal justice system, more specifically, the penal system, has become one of the causal shaping forces in our society. Democracy in the Carceral State in America, Detaining Democracy Criminal Justice in American Civil Life, Volume 651, pp. 288-295, January, 2014. The unduly harsh sentences that have historically plagued the criminal justice system over the past fifty years has been addressed in a several different contexts.

The social science that has established that long term incarceration is detrimental to the individual and the community supports a new approach to the sentencing paradigm. In a study conducted more than twenty years ago, researchers concluded that the longer an individual is incarcerated, the more likely it is that the individual will commit a future crime. In *The Effects of Prison*

*Sentences on Recidivism*, securitepublic.gc.cc.1999, Paul Gedreau, Claire Gogin and Frank

The essential conclusions from this study were:

1.  Prisons should not be used with the expectation of reducing criminal behavior.

2.  On the basis of the present results, excessive use of incarceration has enormous cost implications.

3.  In order to determine who is being adversely affected by prison, it is incumbent upon prison officials to implement repeated, comprehensive assessments of offenders' attitudes, values, and behaviors while incarcerated.

4.  The primary justification of prison should be to incapacitate offenders (particularly, those of a chronic, higher risk nature) for reasonable periods and to exact retribution. (p. 1-2)

Even if imprisonment does not change an offender for the worse, it may affect society's response to him, making it more difficult for him to find stable employment, secure suitable housing, or reconcile with his family. The absence of these informal social controls and strong social bonds may make it easier for the offender to resume drug use or return to a life of crime. Sampson and Laub (1993) take a similar position, arguing that imprisonment weakens offenders' social bonds and reduces their social capital. As they note, arrest and imprisonment lead to the "knifing off" of opportunities to participate in conventional social life." p. 350-351

Over the past two decades social science has offered significant insight into

the efficacy of lengthy periods of incarceration in this struggle to achieve a "just result."

During that same period of time social scientists were in general agreement that long periods of incarceration did not achieve the desired impact. Writing for the American Criminal Law Review, Professor Ian Weinstein reinforces the general consensus.

Addressing the mandatory sentencing paradigm, Weinstein asserts that mandatory minimum statues have created a shift in the power toward the prosecutor so extreme that it has damaged the adversary system and brought injustice. (See *FifteenYears After Federal Sentencing Revolution: How Mandatory Minimums have Undermined Effective Injustice in Narcotics Sentencing*" Ian Weinstein, Fordham University School of Law, American Criminal Law Review, Volume 40:87

(http://ir.lawnet.fordham.edu/cgi/viewcontent.cgi?article=1416&context=faculty_scholarship)

Written almost a decade and a half ago, this study made it clear that the overwhelming majority of criminal justice experts agreed that harsher sentences fail to either provide greater public safety or reduce crime. (Footnote 178) The author asserts that "we are imprisoning people for many years and destructing lives and families while gaining nothing. The current allocation of authority prevents discussion of the severity of these sentences. After all, when mitigation is largely in control of the prosecutor, it makes little sense to mount a funneled

challenge to the harshness of the sentence and there is really nowhere to take the complaint. The current regime of overcriminalization increased prosecutorial discretion and very harsh sentencing reinforces itself." (Page 130-131)  The author concludes that "someday many more Americans will look back and ask how we could lock up so many people for so long for such crimes. (Page 132) Professor  Weinstein's predictions are prophetic. Unfortunately, only now, almost twenty years after the Supreme Court's decision in <u>United States v. Booker</u>, are we coming to the realization that the winds of change are bending towards a more just and reasonable sentencing landscape.

Providing further support to the conclusion by social scientists that longer periods of incarceration are detrimental to society is the recognition that eventually, individuals age out of criminal conduct as a result of the process of maturation. Researchers John H. Laub and Robert J. Sampson concluded "From a policy standpoint, the message is that change is possible, and therefore, it is critical that individuals are given the opportunity to reconnect to institutions like family, school, and work after a period of incarceration or any criminal justice contact for that matter." Understanding Desistance From Crime, Crime and Justice Vol. 28, 1, p.58 (https://dash.harvard.edu/bitstream/handle/1/3226958/Sampson_UnderstandingDesistance.pdf?sequence=4)

These studies support the general contention that longer periods of incarceration have a destructive impact on an individual's chances at rehabilitation.  Given Mr. Rodriguez's compelling mitigation and commitment to

improving his family, a period of incarceration is not consistent with achieving the desired result, a fully rehabilitated, productive member of society. Incarcerating Niko Rodriguez would not provide just punishment under these circumstances.

**C.    The Guidelines and Policy Statements Issued by the Sentencing Commission and the Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.**

Based on the compelling mitigation in this case a probationary sentence for Mr. Rodriguez would not create unwarranted sentence disparities among Defendants with similar records who have been found guilty of similar conduct.

**D.    The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant.**

A sentence of probation will afford adequate deterrence to criminal conduct. As reflected in the letters submitted on his behalf, Mr. Rodriguez has demonstrated for almost a decade since these crimes were committed, that he will not commit another crime and is an exemplary candidate for probation.

**E.    The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.**

Mr. Rodriguez does not need educational or vocational training. Mr. Rodriguez has demonstrated that he has done everything expected to chart a path toward rehabilitation.

- 14 -

## VI. CONCLUSION

Wherefore, on behalf of Niko Rodriguez, I respectfully request that your Honor permit Mr. Rodriguez to continue his exemplary path toward rehabilitation by imposing a probationary sentence.

<div style="margin-left:40%">

Respectfully submitted,
/s/ Paul J. Hetznecker, Esquire
Paul J. Hetznecker, Esquire
Attorney for Defendant, Niko Rodriguez

</div>

Date:  February 16, 2024

## <u>CERTIFICATE OF SERVICE</u>

I, Paul J. Hetznecker, hereby certify that a true and correct copy of

defendant's Sentencing Memorandum was served on the following via the Court's

electronic filing system (ecf):

<div align="center">

Bea Witzleben, Esq.
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19276

Frank Costello, Esq.
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19276

</div>

<u>/s/ Paul J. Hetznecker, Esquire</u>
Paul J. Hetznecker, Esquire
Attorney for Defendant, Niko Rodriguez

<u>Date: February 16, 2024</u>